NO. 12-99-00428-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


KENNETH SYNAR,
§
 APPEAL FROM THE 87TH

APPELLANT/CROSS-APPELLEE,




V.
§
 JUDICIAL DISTRICT COURT OF


UNION PACIFIC RAILROAD COMPANY

COMPANY AND MISSOURI PACIFIC

RAILROAD COMPANY,

APPELLEES/CROSS-APPELLANTS
§
 ANDERSON COUNTY, TEXAS

 

 Kenneth Synar ("Synar") sued the Missouri Pacific Railroad Company doing business as
Union Pacific Railroad Company ("UP") for violations of the Federal Employer's Liability Act
("FELA") and the Federal Safety Appliance Act ("FSAA"). The jury found that UP was negligent
and violated the FSAA, but also found Synar thirty percent contributorily negligent. The trial court
disregarded the jury's finding that UP violated the FSAA and reduced the award by thirty percent
pursuant to the applicable statute. Synar raises two issues on appeal, while UP raises thirty-one
issues and two cross-points. We modify the trial court's judgment to reinstate the jury's finding on
the FSAA issue thus allowing recovery for a violation of the FSAA, making the statutory thirty
percent reduction inapplicable. We further modify the judgment to reflect that Synar take nothing
on his claims for past medical expenses and future medical expenses. As modified, we affirm.


Background

 Synar began working for UP's predecessor on March 27, 1978 as a switchman and brakeman. 
As of the time of trial, he was still employed by UP. While he had worked in several different cities,
he spent the majority of his career working in the railyard at Muskogee, Oklahoma. His job involved
jumping onto moving cars, turning the hand brake wheel to stop them, and throwing switches to
redirect cars to appropriate tracks in order to build trains. In 1990, he began experiencing pain in
his right arm intermittently. He self-treated for years while continuing to work. The pain worsened
progressively. He consulted Dr. Jay Yoo about it for the first time on February 18, 1994. He was
diagnosed as having progressive neuropathy of the ulnar nerve of the right arm. Synar filed suit
against his employer on September 29, 1995. Although his doctors recommended surgery in 1994,
Synar did not have surgery until July 27, 1998. Due to complications, he underwent a second
surgery on August 5, 1998. Synar had worked until the first surgery, then remained off duty until
November 1998. Because his condition deteriorated after he returned to work, upon doctor's orders,
he stopped working in January 1999 on doctor's orders. 


Limitations

 In its issues one through five, UP attacks, in various ways, the jury's answer to question five,
the finding that Synar's case is not barred by the applicable three-year statute of limitations. UP
asserts that the evidence shows Synar told Dr. Yoo that he experienced pain when he turned brake
wheels in 1990. Additionally, Synar told Dr. Charles Lutton, a neurologist who also examined him,
that he had noticed improvement when he switched jobs, which UP asserts occurred in 1991. This,
UP argues, constitutes proof that Synar knew of his injury and its relation to his work at the railroad
as early as 1990, five years before Synar filed suit. Based on this argument, UP contends that
Synar's claim is barred because there is no evidence, or only factually insufficient evidence,
supporting a finding that the case was filed within the limitations period. UP further asserts that the
trial court erred by not granting its motion for directed verdict, its motion for judgment
notwithstanding the verdict, and its motion for new trial, on limitations grounds.

 Synar responds that his cause of action is not premised on a one-time injury. Synar alleges
that he sustained injuries over "many years" in the course of his employment with UP, by engaging
in repetitive and hazardously strenuous motions. He asserts that he did not know he had an injury
until February 18, 1994, when he first saw a doctor about the pain in his arm. Before that date he
did not know that his work at UP aggravated the condition. Applying the discovery rule, he argues,
his suit, which he filed on September 29, 1995, is well within the three year limitations period.

Standards of Review

 If an appellant is attacking the legal sufficiency of an adverse finding of an issue on which
he did not have the burden of proof, the appellant must demonstrate on appeal that there is no
evidence to support the adverse finding. See Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). 
An appeal from the denial of a motion for directed verdict is in essence a challenge to the legal
sufficiency of the evidence. Lochinvar Corp. v. Meyers, 930 S.W.2d 182, 187 (Tex. App.-Dallas
1996, no writ). Likewise, a challenge on appeal that the trial court erred in denying a motion for
judgment notwithstanding the verdict is construed as a legal sufficiency challenge and reviewed in
the same manner. See Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 227-28 (Tex. 1990). In
reviewing no evidence points of error, the reviewing court must consider only the evidence and
inferences tending to support the trial court's finding, disregarding all contrary evidence and
inferences. Wal-Mart Stores, Inc. v. Gonzalez, 968 S.W.2d 934, 936 (Tex. 1998). If there is any
evidence of probative force to support the finding, the no evidence issue must be overruled and the
finding upheld. ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997). 

 If a party is attacking the factual sufficiency of an adverse finding on an issue to which the
other party had the burden of proof, the attacking party must demonstrate that there is insufficient
evidence to support the adverse finding. See Croucher, 660 S.W.2d at 58. In addressing a factual
sufficiency of the evidence challenge, this Court must consider and weigh all of the evidence and
set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). Findings of fact are the
exclusive province of the jury. Bellefonte Underwriters Ins. Co. v. Brown, 704 S.W.2d 742, 744
(Tex. 1986). Accordingly, if there is sufficient competent evidence of probative force to support the
finding, it must be sustained. Beall v. Ditmore, 867 S.W.2d 791, 795-96 (Tex. App.-El Paso 1993,
writ denied). Where there is conflicting evidence, the jury's verdict on such matters is generally
regarded as conclusive. Id. at 796. 

 The standard of review applied to consider a complaint that the trial court erred in denying
a motion for new trial depends on the complaint preserved in the motion. Hicks v. Ricardo, 834
S.W.2d 587, 590 (Tex. App.- Houston [1st Dist.] 1992, no writ). The decision of the trial court to
grant or deny a motion for new trial is an exercise of the trial court's judicial discretion and will not
be overturned on appeal in the absence of an abuse of discretion. Thomas v. Oldham, 895 S.W.2d
352, 356 (Tex. 1995). 

Applicable Law

 The limitations period under FELA is three years from the day the cause of action accrued. 
45 U.S.C.A. § 56 (West 1986). In an FELA action, compliance with the statute of limitations is a
condition precedent to recovery rather than an affirmative defense. Emmons v. Southern Pac.
Transp. Co., 701 F.2d 1112, 1117 (5th Cir. 1983). The burden is on the claimant to allege and prove
that he filed suit within the three-year period. Id. at 1118. When the specific date of injury cannot
be determined because an injury results from continual exposure to a harmful condition over a period
of time, a claimant's cause of action accrues when the injury manifests itself. Urie v. Thompson,
337 U.S. 163, 170, 69 S. Ct. 1018, 1025, 93 L. Ed. 1282 (1949). Accordingly, the discovery rule
applies to determine when an FELA cause of action accrues. See United States v. Kubrick, 444 U.S.
111, 121-23, 100 S. Ct. 352, 359-60, 62 L. Ed. 2d 259 (1979). Inquiries involving the discovery rule
usually entail questions for the trier of fact. Childs v. Haussecker, 974 S.W.2d 31, 44 (Tex. 1998). 
A claim accrues when the claimant should reasonably have been aware of the critical facts of injury
and causation. DuBose v. Kansas City S. Ry., 729 F.2d 1026, 1030 (5th Cir.), cert. denied, 469 U.S.
854 (1984). Awareness of critical facts will impose a duty to investigate the potential cause. Fries
v. Chicago & Northwestern Transp. Co., 909 F.2d 1092, 1095 (7th Cir. 1990). 

Discussion

 The jury was asked on what date did Synar first become possessed of the critical facts of his
alleged work injury and its causation. The jury answered February 18, 1994. The record shows that
Synar first consulted a doctor about the pain in his arm on February 18, 1994 when he saw Dr. Yoo. 
The medical records of each doctor he saw about this problem reflect that the pain began in 1990 and
gradually increased in severity until early 1994 when he felt he needed to see a doctor. These
medical records indicate that, by early 1994, Synar had come to believe he had an injury caused by
his work on the railroad and that it occurred gradually over the course of his employment. Synar's
testimony reiterated these facts. He emphasized that, while he experienced some pain in 1990, he
did not know at that time that he had an injury. He also stated that in 1990 and 1991, he did not even
experience pain on a daily basis. Only one of Synar's co-workers testified that he complained of
pain and that was in 1994 and 1995. 

 After reviewing the evidence and inferences tending to support the finding that limitations
had not run before Synar filed suit, we conclude that UP's legal sufficiency challenges fail. There
is evidence of probative force to support the jury's finding that Synar first became aware of the
critical facts of his injury and its cause on February 18, 1994, the day he first saw a doctor about the
pain in his arm. See DuBose, 729 F.2d at 1030. Accordingly, we overrule issues one, three, and
five. 

 UP also contends the evidence is factually insufficient to support the finding that Synar's
cause of action is not barred by limitations. UP asserts that the evidence shows Synar knew of his
injury in 1990 and 1991 and had a duty to investigate the cause at that time. UP also asserts that, in
1990 and 1991, Synar's pain was aggravated by work and disappeared when he was not working. 
This, UP argues, put Synar on notice that his injury was work related. We consider all the evidence
on the issue of limitations to determine if Synar should reasonably have been aware of critical facts
of injury and causation more than three years before September 29, 1995.

 To support its argument, UP relies largely on medical records containing statements by Synar
that his injury occurred over as much as a twenty-year period. These statements were made by Synar
between the years 1994 and 1996. The records merely indicate that by early 1994, Synar believed
he had an injury and it was caused by his work at UP over the course of many years. They do not
indicate that he knew of the injury between four and twenty years earlier. 

 In his notes detailing his April 25, 1994 visit with Synar, in a paragraph entitled "History of
Present Illness," Dr. Lutton referred to Synar's condition over the "past 4 years," "[o]ver the last
year," and "[c]urrently." In the next sentence he stated that "Synar has noted some mild
improvement since he has switched jobs." The remainder of the paragraph speaks in terms of
Synar's present condition. No explanation was included as to the nature of the job he switched to
or the dates he worked a different job. Synar testified that he was a switchman until 1997 and had
no independent recollection of switching jobs. 

 When shown a document purported to be his work history, Synar agreed that it indicated that
he had been a through-freight conductor and brakeman for a period of about two or three months in
1991. This document was not placed in evidence. UP contends that Dr. Lutton's reference to
improvement after switching jobs is a reference to that two or three-month period in 1991, thus
showing his symptoms improved in 1991. UP further argues that the presence of symptoms in 1990
that improved in 1991 when he changed jobs constituted the required critical facts to trigger Synar's
duty to investigate in 1991, outside the limitations period. We disagree. 

 Synar's symptoms were intermittent in 1990, not ongoing. The record does not clearly
indicate that the improvement resulting from changing jobs, referenced by Dr. Lutton, occurred in
1991. The record does not show that the symptoms had manifested themselves sufficiently enough
in 1990 and 1991 to alert Synar to the need to see a doctor. Further, Synar's acknowledgment in
1994, that in 1990 he had felt some pain while working that dissipated when he was not working,
is not tantamount to an admission that he had an injury and that it was work related. We conclude
that there is sufficient competent evidence of probative force to support the jury's finding that Synar
filed his cause of action within the limitations period. See Beall, 867 S.W.2d at 795-96. As the
jury's finding was not in error, the trial court did not abuse its discretion in denying UP's motion for
new trial on limitations grounds. See Thomas, 895 S.W.2d at 356. We overrule UP's issues two
and four.


Admissibility of Testimony

Quentin Pickering

 In its fourteenth issue, UP asserts that the trial court erred in allowing the testimony of
Quentin Pickering, Synar's expert on railroad safety. UP identified eight objections it made at trial 
to eight specific statements on various grounds. Additionally, at the end of Pickering's testimony,
UP moved to strike Pickering's entire testimony on the grounds that it was irrelevant and that
Pickering "has no business being an expert in this case." UP contends that Pickering should not have
been allowed to testify that the railroad was negligent. UP characterizes Pickering's testimony as
absurd and unfounded, with no basis in the law or evidence, and claims that Pickering has no
expertise. UP has not included concise argument supported by appropriate citations to authority
regarding each of the eight individual objected-to statements referenced under this issue. See Tex.
R. App. P. 38.1(h). Accordingly, we interpret this issue as a complaint that the trial court erred in
denying its motion to strike Pickering's entire testimony. See Tex. R. App. P. 38.1(e).

 If technical or other specialized knowledge will assist the trier of fact, a witness qualified as
an expert may testify in the form of an opinion or otherwise. Tex. R. Evid.702. Whether a witness
is qualified to offer expert testimony is a matter committed to the trial court's discretion. United
Blood Servs. v. Longoria, 938 S.W.2d 29, 30 (Tex. 1997) (per curiam). The trial court must
determine if the putative expert has knowledge, skill, experience, training, or education that would
assist the trier of fact. Id. at 30-31. The burden of establishing an expert's qualifications is on the
offering party. Id. at 31. An expert may state an opinion on a mixed question of law and fact as long
as the opinion is confined to the relevant issues and is based on proper legal concepts. Birchfield
v. Texarkana Mem. Hosp., 747 S.W.2d 361, 365 (Tex. 1987). 

 Contrary to UP's assertion, Pickering's background includes much more than just "writing
safety rules." He worked for UP's predecessors since 1959 in progressively more responsible
positions in the area of safety regulations until his retirement, almost thirty years later, in 1988. He
wrote, interpreted, and taught safety rules, was responsible for rules compliance and safety
performance in switching yards, and helped write a common safety rule book for use by several
railroads. In determining that Pickering qualifies as an expert, the trial court did not act without
reference to any guiding rules or principles. See Longoria, 938 S.W.2d at 31. Pickering qualifies
as an expert in the field of railroad safety. As Synar's causes of action are based largely on the
allegation that UP negligently failed to provide a safe workplace, Pickering's experience and training
are focused on prominent issues presented in this case. The trial court did not abuse its discretion
in allowing Pickering to testify as an expert. Id. at 30-31. As an expert, Pickering could properly
testify that UP's actions constituted negligence. Birchfield, 747 S.W.2d at 365. We overrule UP's
fourteenth issue.

Dr. Tyler Kress, Ph.D.

 In its twenty-third issue, UP contends the trial court erred in admitting testimony of Dr. Tyler
Kress, Ph.D. Specifically, UP complains of Kress's testimony that, from an ergonomics standpoint,
the Muskogee yard was not reasonably safe and there was careless attention paid to ergonomics
issues. Without further explanation, UP states that this testimony should have been excluded for the
same reasons Pickering's testimony should have been excluded.

 We find no trial objection to Kress's designation as an expert witness. To the extent UP is
asserting that he should not have been designated as an expert, that complaint has been waived. See
Kroger Co. v. Betancourt, 996 S.W.2d 353, 360 (Tex. App.-Houston [14th Dist.] 1999, pet. denied). 
Moreover, his qualifications are adequately explained in the record. His education and work are in
the areas of biomedical engineering and human factors engineering. His work, including teaching,
research, and consulting, involves the application of engineering principles to the human body,
focusing on injury prevention. This includes the biomechanical and ergonomical engineering aspects
of safety and injury. Synar's suit involved allegations that UP did not provide him with a safe place
to work, leading to his repetitive-use injury. Kress could properly testify as to these matters. See
Birchfield, 747 S.W.2d at 365. We overrule UP's twenty-third issue.

Physicians

 In its twenty-fourth issue, UP contends that the trial court erred in admitting testimony of Dr.
Lutton, Dr. Charles Fullenwider, and Dr. James Slater concerning causation. It asserts that their
testimony is rife with misuse of and abuse of hypothetical questions. UP contends that the questions
and their responses should have been excluded because they confused and misled the jury and
prejudiced UP. It asserts that Synar's counsel was attempting to recite his theory of the case, making
factual assumptions that were not facts in evidence and skewing the evidence. Finally, UP asserts
without argument that such testimony was not grounded in valid scientific knowledge.

 Opinion testimony of an expert witness may be based on hypothetical questions embracing
facts supported by the evidence. Clark Equip. Co. v. Pitner, 923 S.W.2d 117, 123 (Tex. App.-
Houston [14th Dist.] 1996, writ denied). A trial judge has wide discretion in ruling on the propriety
of a hypothetical question and his determination will be overturned only on a clear showing of abuse. 
Thomas v. St. Joseph Hosp., 618 S.W.2d 791, 794-95 (Tex. Civ. App.-Houston [1st Dist.] 1981,
writ ref'd n.r.e.). Accordingly, a trial court has considerable latitude in determining whether
hypothetical questions posed to an expert witness are based upon a fair assumption of facts. Pitner,
923 S.W.2d at 123. It is not necessary that the facts upon which an expert bases his opinion be
uncontroverted. Collins v. Chipman, 41 Tex. Civ. App. 563, 95 S.W. 666, 671 (1906, writ ref'd). 
Further, a hypothetical can be based on evidence merely tending to show the fact. Gulf, W.T.&P.
Ry. Co. v. Abbott, 146 S.W. 1078, 1082 (Tex. Civ. App.-San Antonio 1912, writ ref'd).

 The hypotheticals asked each doctor to assume that Synar worked as a switchman for UP for
many years, turning hand brakes and throwing switches. The doctors were asked to assume Synar
was required to exert significant force to do so, at times in excess of one hundred pounds of force. 
They were also asked to assume that he was required to set approximately seventy-five to one
hundred hand brakes per day and to throw approximately fifty to one hundred switches per day. 
They were then asked whether Synar's work at UP caused or contributed to the ulnar neuropathy of
his right arm. 

 The record shows that Synar was a switchman for the railroad since 1978. Dr. Kress testified
that he tested some hand brakes and switches in the Muskogee yard and found that it took in excess
of one hundred pounds of force to manipulate at least one brake wheel tested and to throw the
switches he tested. Synar testified that, on average, he set between seventy-five and one hundred
hand brakes on a typical day and threw between seventy-five and one hundred switches a day. 
Gerald Garretson, a longtime railroad employee who worked in the Muskogee yard testified that it
takes fifty, seventy-five or one hundred pounds of pressure to tighten hand brakes. Although other
witnesses testified that Synar set, or in the vernacular, tied, fewer hand brakes and threw fewer
switches, it is not necessary that the facts relied on by the doctors be uncontroverted. See Collins,
95 S.W. at 671. Because the hypothetical questions asked of the doctors were based on a fair
assumption of facts presented by the evidence, the trial court did not abuse its discretion in allowing
them. See Pitner, 923 S.W.2d at 123.

 UP's final assertion under this issue, that the testimony based on the hypothetical questions
was not grounded in valid scientific knowledge, was not raised at trial. Accordingly, this argument
is waived. See General Motors Corp. v. Sanchez, 997 S.W.2d 584, 590-91 (Tex. 1999) (allowing
reliability challenge on appeal in absence of trial objection usurps trial court's discretion to screen
out unreliable expert evidence). We overrule UP's twenty-fourth issue.

Kenneth Synar

 In its twenty-second issue, UP contends the trial court erred in refusing to allow cross-examination of Synar regarding disability benefits he was presently drawing through the Railroad
Retirement Board. UP asserts that Synar opened the door by testifying about his financial hardship. 
Additionally, evidence of his eligibility for railroad retirement benefits was before the jury. Under
these circumstances, UP argues, it was entitled to inquire into Synar's eligibility for and receipt of
railroad retirement disability benefits and his receipt of money from other sources.

 On direct examination, Synar testified that, upon retirement, he will get retirement benefits. 
In response to counsel's inquiry into the emotional or mental effects of his injury and the loss of his
career and hobbies, Synar explained that he does not have a job to go to and he does not have any
money to do anything with. He further explained that he cannot plan or go anywhere.

 Evidence of collateral source payments, including disability payments, is ordinarily
inadmissible. Eichel v. New York Cent. R.R. Co., 375 U.S. 253, 255, 84 S. Ct. 316, 317, 11 L. Ed.
2d 307 (1963). However, such evidence may be admissible for impeachment purposes when the
plaintiff has given testimony inconsistent with the receipt of payments. Lange v. Missouri Pac. R.R.
Co., 703 F.2d 322, 324 (8th Cir. 1983). For instance, plaintiff will have opened the door to
testimony regarding disability payments where he injects the issue of his poverty. Mundy v.
Shippers, Inc., 783 S.W.2d 743, 744 (Tex. App.-Houston [14th Dist.] 1990, writ denied).

 We disagree that, by his testimony, Synar opened the door for evidence of disability benefits. 
He never stated whether he was receiving such benefits. Therefore, there was no need to impeach
him on that basis. Further, his reference to money was not a declaration of poverty. He was
explaining the emotional and mental effects of his present situation, not his financial status. The trial
court did not abuse its discretion in refusing to allow cross-examination of Synar on the issue of
retirement disability payments. Eichel, 375 U.S. at 255, 84 S. Ct. at 317. We overrule UP's issue
twenty-two.


Negligence

 UP's issues seven through eleven concern jury charge question number one, which inquired
whether any negligence by UP caused Synar's injuries, and the jury's affirmative answer to that
question. In these issues, UP contends that there is no evidence warranting submission of question
number one to the jury, there is no evidence, or only insufficient evidence, supporting the jury's
answer to question number one, and the trial court erred in denying UP's motions for directed verdict
and for judgment notwithstanding the verdict as to negligence. More specifically, UP argues that
there is no evidence, or insufficient evidence, to establish that it breached its duty to provide Synar
a reasonably safe workplace, that UP could have foreseen Synar's injury, or that the conduct of UP
caused Synar's injury.

Standards of Review

 In addressing the no evidence challenges, including the challenges to the trial court's denial
of UP's motions for directed verdict and for judgment notwithstanding the verdict and the propriety
of submitting the negligence question to the jury, we consider only the evidence and inferences
tending to support the finding. Wal-Mart Stores, Inc., 968 S.W.2d at 936; Elbaor v. Smith, 845
S.W.2d 240, 243 (Tex. 1992); Mancorp, Inc., 802 S.W.2d at 227-28; Lochinvar Corp., 930 S.W.2d
at 187. If there is any evidence of probative force to support the finding, it will be upheld. 
McLaughlin, 943 S.W.2d at 430. However, factual sufficiency reviews of a jury's finding of
liability under the FELA is precluded. Texas & Pac. Ry. Co. v. Roberts, 481 S.W.2d 798, 800 (Tex.
1972).

Applicable Law

 When FELA cases are brought in state court, federal law governs the substantive rights of
the parties and state rules govern procedural matters. Mitchell v. Missouri-Kansas-Texas R.R. Co.,
786 S.W.2d 659, 661 (Tex. 1990) (on reh'g). Under federal law, a railroad carrier is liable for
damages to its employees who suffer an injury "resulting in whole or in part from the negligence of
any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency,
due to its negligence, in its cars, engines, appliances . . . or other equipment." 45 U.C.S.A. § 51
(West 1986). A FELA plaintiff must prove the common law components of negligence, including
duty, breach, foreseeability, causation, and injury. Adams v. CSX Transp., Inc., 899 F.2d 536, 539
(6th Cir. 1990).

Breach of Duty and Forseeability

 Railroads have a duty to provide employees a reasonably safe place in which to work and
such protection against hazards as would be expected of a person in the exercise of ordinary care
under those circumstances. Urie, 337 U.S. at 178 n.16, 69 S. Ct. at 1029 n.16; Missouri Pac. R.R.
Co. v. Roberson, 25 S.W.3d 251, 256 (Tex. App.-Beaumont 2000, no pet.). Ordinary care must be
in proportion to the danger to be avoided and the consequences that might reasonably be anticipated
from the neglect. Urie, 337 U.S. at 179, 69 S. Ct. at 1029. Ordinary care must be commensurate
with known dangers. Id. However, "known dangers" does not mean that the injury must have
occurred on a previous occasion to the same or a similarly situated worker. Aparicio v. Norfolk &
Western Ry. Co., 84 F.3d 803, 810-11 (6th Cir. 1996). 

 The carrier breaches its duty to provide a safe workplace if it knew or should have known
of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and
protect its employees. Ulfik v. Metro-North Commuter R.R., 77 F.3d 54, 58 (2nd Cir. 1996). The
touchstone of this negligence inquiry is the issue of foreseeability, whether or not the carrier knew
or should have known of the potential hazard. Id. The test for foreseeability does not require that
the negligent person should have been able to foresee the injury in the precise form in which it in fact
occurred. Adams, 899 F.2d at 540. Negligence attaches if the carrier knew or by the exercise of due
care should have known that prevalent standards of conduct were inadequate to protect employees. 
Urie, 337 U.S. at 178, 69 S. Ct. at 1028.

 The record shows that in 1988 there were six carmen working in the Muskogee yard
inspecting and repairing cars. In 1992, there were only three. After that, the number continued to
diminish. Accordingly, there was an insufficient number of men to inspect and repair the cars in the
Muskogee railyard. One longtime railroad employee, Gerald Garretson, testified that between thirty
and thirty-three percent of hand brakes on cars in the Muskogee yard were defective. He also
complained that he did not have the right tools to repair them. Quentin Pickering, Synar's safety
expert, testified that UP failed to properly maintain equipment and was negligent in requiring Synar
to work under those circumstances. He explained that the repetitive nature of the job made it
ergonomically incapable. 

 Synar testified that, on average, he set seventy-five to one hundred hand brakes on a typical
day and threw seventy-five to one hundred switches a day. He estimated that about thirty percent
of the hand brakes he encountered required a lot of force and two hands to set and that about five
percent were inoperative. He explained that some of the hand brakes and switches were in disrepair. 
He said he had to push or pull weights of more than twenty-five pounds constantly and had to push
and pull weights of more than fifty pounds occasionally.

 Douglas Hammer, another railroad employee, testified that ten to fifteen percent or "a lot"
of the brakes that he tied were extremely hard to tie. He did not consider those brakes to be safe. 
He also stated that they had problems with eighty percent of the switches and that the switches were
in "bad shape," needing cleaning and lubrication. He opined that the Muskogee yard was poorly
maintained in the '90's. He claimed that no one did inspections from 1994 to 1998 and that there
were not enough maintenance people.

 Gary Scott, the highest level management official UP has in the Muskogee yard, testified that
he has no responsibility to make sure the equipment is in good condition. He also stated that in the
two years before this trial, some of the switches were replaced with different models that are easier
to throw. He testified that if a hand brake is difficult to turn, that car should be set aside for repair.

 Dr. Tyler Kress, the biomedical engineer, viewed the Muskogee yard from an ergonomics
standpoint and determined that the yard was not reasonably safe. He explained that the field of
ergonomics is the study of how humans interface with their work environment, particularly
considering productivity and safety. Kress testified that one of the brake wheels he tested required
in excess of one hundred pounds of poundage or force to manipulate it. Also, it took in excess of
one hundred pounds to throw the switches that were tested. This amount of force is in excess of the
recommended weight loads of the National Institute of Occupational Safety. It is undisputed that
UP provided no ergonomics training or information regarding repetititve trauma disorders or overuse
injuries to its Muskogee employees.

 Thus, the evidence showed that there was an insufficient number of employees working with
equipment that was in disrepair and improperly maintained. The Muskogee yard's management did
not feel responsible for maintaining equipment and provided no ergonomics training or information. 
There was testimony that it takes an inordinate amount of force to tie brakes and throw switches. 
Finally, from the fact that UP replaced some switches with a different type that is easier to throw,
the jury could infer that the old switches needed to be replaced because they were difficult to throw. 
See Heater v. Chesapeake and Ohio Ry. Co., 497 F.2d 1243, 1247 (7th Cir.), cert. denied, 419 U.S.
1013 (1974) (In passing on fault and causality, the jury has a broad power to engage in inferences.). 
Accordingly, Synar presented some evidence that UP breached its duty of care.

 Regarding foreseeability, the record indicates that UP should have known that Synar could
have sustained on the job injuries. Contrary to UP's assertion, it was not necessary for Synar to have
notified UP of his injuries or to have shown that other employees had previously suffered the same
injury. See Aparicio, 84 F.3d at 810-11. Moreover, the jury had before it evidence from which it
could conclude that Synar's injury was foreseeable. Garretson testified that he had complained to
his superiors that there was an insufficient number of men to take care of the number of cars in need
of repair. Synar testified that he had reported to Scott that the equipment was worn out and did not
operate properly. He also testified that each day during one time period, he reported an average of
five or six malfunctioning brakes to a past supervisor, Freddy Lowrance. Finally, Kress testified that
the Association of American Railroads has been doing research in the field of ergonomics since the
early 1980's and started publishing their findings shortly thereafter. That association has made its
articles available for railroad use. Accordingly, UP has had access to information in the field of
ergonomics, including studies on the effects of actions involving repetitive flexion and force such
as tying hand brakes and throwing switches. We conclude that Synar presented some evidence to
show UP knew or should have known of the potential hazard presented by requiring Synar to engage
in activities requiring the repetitive use of his right arm and hand and that UP breached its duty to
provide a safe workplace. See Urie, 337 U.S. at 178, 69 S. Ct. at 1028; Ulfik, 77 F.3d at 58-59.

Causation 

 UP asserts that there was insufficient evidence to establish that any negligence by UP actually
caused Synar's injuries. It argues that there was no showing that Synar was injured on any specific
piece of equipment and no showing he was injured on the equipment tested by Kress. UP also relies
on the testimony of railroad employees stating that Synar never complained about the equipment and
that the hand brakes and switches were well maintained.

 The statute establishes a standard of "in whole or in part" causation which replaces the
common law standard of proximate causation. See 45 U.C.S.A. § 51; Rogers v. Missouri Pac. R.R.
Co., 352 U.S. 500, 507, 77 S. Ct. 443, 449, 1 L. Ed. 2d 493 (1957). With regard to causation, an
FELA case presents the single question of whether there is any probative evidence to support a
finding that employer negligence played any part, even the slightest, in producing the injury or death
for which damages are sought. Rogers, 352 U.S. at 506, 77 S. Ct. at 448. The burden of the
employee is met, and the obligation of the employer to pay damages arises, when there is proof, even
though entirely circumstantial, from which the jury may reasonably make that inference. Rogers,
352 U.S. at 508, 77 S. Ct. at 449. If that test is met, the judge is bound to find that a case for the jury
is made out whether or not the evidence allows the jury a choice of other probabilities. Rogers, 352
U.S. at 507, 77 S. Ct. at 449. 

 The evidence UP would have us consider on this issue is not controlling. Our research
revealed no legal basis to require Synar to prove he was injured on a particular piece of equipment
and UP directs us to no such authority. While there was testimony that Synar never complained
about the equipment and that the hand brakes and switches were well maintained, there was also
testimony to the contrary. It was for the jury to decide which testimony to believe. See Beall, 867
S.W.2d at 796. In addition to the testimony that railroad equipment was not well maintained, we
look to the medical evidence to resolve the issue of causation.

 Dr. Charles Fullenwider, a neurosurgeon who had examined Synar, explained that the
relatively constant, exertional and repetitive use of hands and arms in an occupational setting are risk
factors for development of ulnar neuropathy. The jury heard testimony from several different
witnesses regarding the repetitive nature of Synar's job tasks. Dr. Fullenwider also testified that
Synar's work was likely a major causative factor leading to his injuries. Dr. Lutton testified that
Synar's work factors are the most probable explanation as to the cause of his injury. Dr. James
Slater, the orthopedic surgeon who performed Synar's surgeries, testified that, with reasonable
medical certainty, he would attribute Synar's injuries to his work on the railroad. This is enough
probative evidence from which the jury may with reason make the inference that UP's negligence
caused Synar's injury. See Rogers, 352 U.S. at 508, 77 S. Ct. at 449. Under these circumstances,
the judge was bound to find that a case for the jury has been made out. Rogers, 352 U.S. at 507, 77
S. Ct. at 449. Accordingly, the judge properly submitted question number one to the jury, the
evidence is legally sufficient to support the jury's answer to question number one, and the trial court
properly denied UP's motions for directed verdict and for judgment notwithstanding the verdict as
to negligence. Pursuant to applicable law, we shall not address UP's factual sufficiency complaints. 
Roberts, 481 S.W.2d at 800. We overrule issues seven through eleven. 



Interstate Commerce

 In its twelfth and thirteenth issues, UP contends the trial court erred in denying its motions
for directed verdict and for judgment notwithstanding the verdict by which UP requested judgment
on the ground that Synar presented no evidence that UP was a common carrier engaged in interstate
commerce. UP also contends that Synar failed to present evidence that he was engaged in interstate
commerce at the time of the incident for which suit was brought.

Standard of Review

 In attacking the denial of its motions for directed verdict and for judgment notwithstanding
the verdict, UP must show there is no evidence to support the rulings. Mancorp, Inc., 802 S.W.2d
at 227-28; Lochinvar Corp., 930 S.W.2d at 187. The reviewing court considers only the evidence
and inferences tending to support the trial court's ruling. Wal-Mart Stores, Inc., 968 S.W.2d at 936.

Applicable Law

 To recover under FELA, the plaintiff must prove that the defendant is a common carrier
engaged in interstate or foreign commerce and that the plaintiff suffered the injury while employed
in such commerce. 45 U.S.C.A. § 51; Hallaway v. Thompson, 148 Tex. 471, 226 S.W.2d 816, 819
(1950). The employee must show that his duties at least in part are in the furtherance of interstate
or foreign commerce or that they affect such commerce directly or closely and substantially. Id. at
824 (on reh'g). It is enough if any part of the employee's duties further or affect interstate
commerce. Reed v. Pennsylvania R.R. Co., 351 U.S. 502, 506, 76 S. Ct. 958, 962, 100 L. Ed. 1366
(1956). A railroad is engaged in interstate commerce when it carries an article from one state to
another and the character of the commerce continues without cessation, until such article reaches its
destination. Louisville & Nashville R.R. Co. v. Meadors' Adm'r, 197 S.W. 440, 441 (Ky. 1917).

Discussion 

 Initially, we note that UP did not, at trial, raise the issue of Synar's failure to prove that he
was engaged in interstate commerce at the time he was injured. To the extent UP now complains
of that issue, the complaint is waived. Tex. R. App. P. 33.1. However, the record supports a trial
court ruling denying such a motion on the issue of whether both UP and Synar were engaged in
interstate commerce at the time Synar was injured.

 Gary Scott, UP's highest management official in Muskogee explained that, as Manager of
Terminal Operations, he oversees an area from Wagner, Oklahoma to Van Buren, Arkansas. David
Hoaglan, a UP foreman general, testified that he was responsible for an area spanning three states,
Oklahoma, Kansas, and Arkansas. Jerrold Garretson testified that trains came into the Muskogee
yard from Kansas and Texas, as well as from other Oklahoma yards. Synar testified that, while in
UP's employ, he worked in Oklahoma, Kansas, Texas, and Louisiana. Synar explained that, while
working in the Muskogee yard, he "built fields" for the North Platt Fort Worth train, and for a
northbound train, in addition to building the Pryor and Tulsa, Oklahoma locals. Paul Goodin
confirmed that the men on Synar's shift had to separate some cars from through freights and switch
those cars to other tracks. Freddy Lowrance testified that the cars that came into the Muskogee yard
that Synar used to make up the Tulsa and Pryor locals arrived from all points on the railroad,
including California, Wyoming, and "the east." On Lowrance's shift, they ran trains to Texas,
Kansas, and Arkansas.

 This evidence shows that UP operates in several different states and moves its trains from
one state to another in interstate commerce. Further, the cars Synar stopped, switched, and moved
came from states other than Oklahoma and some were destined for states other than Oklahoma. 
When he built fields for the through freights, which were destined for other states, Synar engaged
in interstate commerce even if the cars he moved were destined only for other locations within
Oklahoma. See Baltimore & O.R. Co. v. Darling, 3 F.2d 987, 987-88 (6th Cir. 1925) (Yard
brakeman injured on intrastate car while building an interstate train was engaged in interstate
commerce for purposes of FELA.); Pennsylvania R.R. Co. v. Morrison, 3 F.2d 986, 986-87 (6th Cir.
1925) (All movements of interstate cars, including a switching movement within one yard, form a
part of the entire interstate transportation.); McCall v. Pitcairn, 6 N.W.2d 415, 421 (Iowa 1942)
(Because an interstate train in a switching yard retains its interstate character, a switchman injured
in the process of adding cars to that train is covered by FELA.); Rogers v. Mobile & Ohio R.R. Co.,
85 S.W.2d 581, 585-86 (Mo.), cert. denied, 296 U.S. 642 (1935) (Where an interstate train picks up
or sets out cars at a railyard, such action is incident to interstate transportation, whether the
individual cars are interstate or local in character.). Accordingly, although Synar's main duty may
have been to make up two local trains, he was also involved in furthering interstate transportation. 
Synar's injury was caused by the repetitive use of his arm over the course of many years during
which time he moved both interstate and intrastate cars. Considering the nature of the injury as well
as the constantly changing interstate/intrastate character of his work, we conclude that Synar met his
burden to show that he and UP were engaged in interstate commerce at the time of his injury. The
record presents some evidence of probative force supporting the trial court's denial of UP's motions
for directed verdict and for judgment notwithstanding the verdict on the issue of whether UP was
a common carrier engaged in interstate commerce at the time of the injury and whether Synar was
engaged in interstate commerce at the time of the injury. Accordingly, we overrule UP's issues
twelve and thirteen.


Federal Safety Appliance Act

Background

 Synar alleged in his petition that UP, in violation of the FSAA, used rail cars that were not
equipped with efficient hand brakes. In question four of the charge, the jury was asked if the failure,
if any, of UP to provide cars in proper condition and safe to operate without unnecessary danger of
personal injury was a cause of the occurrence in question. The accompanying instruction set out the
text of the hand brake provision of the FSAA as it read before the 1994 recodification: "It shall be
unlawful for any common carrier subject to the provisions of . . . this title to haul, or permit to be
hauled or used on its line, any car subject to the provisions of said sections not equipped with . . .
efficient hand brakes." Also, it defined "inefficient" as "not producing or not capable of producing
the desired effect, incapable, incompetent or inadequate." The jury answered, "yes" to question four.

 UP filed a motion for judgment notwithstanding the verdict or alternatively to disregard
special issues. UP argued that there was no evidence that any car caused any injury to Synar. 
Further, UP argued that the FSAA does not apply to switching operations because switching does
not constitute hauling or use on a line. It also argued that the answer to question four should be
disregarded because Synar did not identify a particular, defective hand brake that caused his injuries. 
The trial judge explained on the record that he agreed that the FSAA does not apply to switching
operations and, therefore, Synar did not show that the allegedly defective cars contributing to his
injury were being used on UP's line as required by the FSAA and that Synar must, but did not,
identify a particular defective hand brake. The trial judge disregarded the jury's answer to question
four thereby denying Synar recovery under the FSAA. As a result, FELA section 53, in conjunction
with the jury's finding that Synar was thirty percent contributorily negligent, required the trial judge
to deduct thirty percent of the jury's total award. See 45 U.S.C.A. § 53 (West 1986); Rogers, 352
U.S. at 507 n.13, 77 S. Ct. at 449 n.13.

Standard of Review

 A trial court may disregard a jury's findings and grant a motion for judgment notwithstanding
the verdict, when the evidence is conclusive and one party is entitled to judgment as a matter of law. 
Mancorp, Inc., 802 S.W.2d at 227-28. We must review the record in the light most favorable to the
jury findings, considering only the evidence and inferences which support the findings and rejecting
the evidence and inferences contrary to the findings. Id. at 227. If there is more than a scintilla of
competent evidence to support the jury's finding, then the judgment notwithstanding the verdict will
be reversed. Navarette v. Temple Indep. Sch. Dist., 706 S.W.2d 308, 309 (Tex. 1986).

Applicable Law 

 The Safety Appliance Act imposes absolute liability on railroad carriers for violations of that
act's safety standards. Myers v. Reading Co., 331 U.S. 477, 482, 67 S. Ct. 1334, 1337, 91 L. Ed.
1615 (1947). Pursuant to the FSAA, a railroad is required to use only cars equipped with efficient
hand brakes. 49 U.S.C.A. § 20302(a)(1)(B) (West 1997). (1) A railroad may be found liable for a
violation of the FSAA if the jury reasonably can infer from the evidence that the hand brake which
caused the injuries was on a car which the railroad was then using on its line, in interstate commerce,
and that the brake was not an efficient hand brake. Myers, 331 U.S. at 482-83, 67 S. Ct. at 1338. 
An inefficient hand brake is one that fails to function properly. Myers, 331 U.S. at 483, 67 S. Ct.
at 1338.

Switching Operations

 In his first issue, Synar contends the trial court erred in determining that the Safety Appliance
Act does not apply to switching operations and, therefore, he cannot recover under the FSAA. He
further contends the trial court erred in disregarding the jury's answer to question four, by which the
jury found the railroad violated that act, and in reducing the jury's award accordingly.

 Synar's FSAA cause of action is based on an injury allegedly occurring solely while he
performed switching operations. UP relies on a recent case from the Fourth Circuit, Phillips v. CSX
Transportation, Inc., 190 F.3d 285 (4th Cir. 1999), cert. denied, 529 U.S. 1004 (2000), to support
its argument that the FSAA does not apply to switching operations. Phillips was, at the time of his
injury, engaging the hand brakes on a completed train prior to turning the train over to the car
department for its predeparture inspection. He was injured when the hand rail he held on to gave
way and he fell to the ground. Based on its interpretation of other case law, the Fourth Circuit started
with the premise that the FSAA does not apply to switching operations because, it determined, those
activities do not fall within the definition of "in use" under the act. Id. at 289. 

 The focal point of the opinion was not whether the FSAA applies to switching operations,
but rather, the court's discussion of whether the train was involved in switching operations or
whether it was "in use" under the FSAA at the time of Phillips' injury. The court characterized the
key issue in the case as "[d]etermining the point at which switching operations end and a train
becomes 'in use.'" Id. Considering where the train was located at the time of the accident and the
activity Phillips was engaged in at the time of the injury, the court concluded that he was injured at
the end of the switching process, rather than at the beginning of the departure process. With the
conclusion that switching operations do not fall within the definition of "in use" as its foundation
and starting point for analysis, the court held that the train upon which Phillips was injured was not
in use at the time of his injury. Therefore, Phillips could not recover on his FSAA claim. Id. at 289-90. As we shall explain, we conclude that Phillips is based on a faulty premise. 

 Air-brakes and hand brakes are addressed separately within the FSAA. Section
20302(a)(1)(B) requires vehicles to be equipped with efficient hand brakes. 49 U.S.C.A. §
20302(a)(1)(B). "Vehicle" is defined as a car, locomotive, tender, or similar vehicle. 49 U.S.C.A.
§ 20301(a) (West 1997). Section 20302(a)(5) requires trains to be composed of enough vehicles
equipped with power or train brakes so that the train's speed can be controlled without the use of
hand brakes. 49 U.S.C.A. § 20302(a)(5)(A). Thus, the FSAA makes a distinction between trains,
which are stopped with the use of air-brakes, and cars, which are stopped with the use of hand
brakes. See 49 U.S.C.A. § 20302(a); United States v. Erie R.R. Co., 237 U.S. 402, 407-08, 35 S.
Ct. 621, 624, 59 L. Ed. 1019 (1915). In railroad yards, incoming trains are broken up and cars are
assembled and coupled into outgoing trains. Erie R.R. Co., 237 U.S. at 408, 35 S. Ct. at 624. Use
of the air-brake system is impracticable in railroad yards. Grand Rapids & I. Ry. Co. v. United
States, 249 F. 650, 653 (6th Cir. 1918). Accordingly, yard movements, which are switching
operations, are not within the air-brake provision. Erie R.R. Co., 237 U.S. at 408, 35 S. Ct. at 624. 
In contrast, the hand brake provision is ascribable to the necessity of controlling the movements of
cars in yards and elsewhere, when trains have been broken up or are being made up. United States
v. Great N. Ry. Co., 229 F. 927, 930 (9th Cir. 1916). With this law in mind, we consider the Phillips
opinion.

 The Phillips court broadly stated that "the FSAA does not apply to train cars involved in
switching operations" and cited three cases, none of which stand for that proposition. Phillips, 190
F.3d at 289. Those three cases are United States v. Seaboard Air Line Railroad, Co., 361 U.S. 78,
80 S. Ct. 12, 4 L. Ed. 2d 25 (1959), United States v. Northern Pacific Railway Co., 254 U.S. 251,
41 S. Ct. 101, 65 L. Ed. 249 (1920), and Trinidad v. Southern Pacific Transportation Co., 949 F.2d
187 (5th Cir. 1991). In Seaboard Air Line Railroad, the railroad had been cited for failure to
comply with the air-brake provisions while moving trains within a yard. Accordingly, the Supreme
Court was applying the air-brake provisions when it distinguished "train movements" from
"switching operations." Seaboard Air Line R.R. Co., 361 U.S. at 80, 80 S. Ct. at 14. The Court
pointed out that there is no "train" in a true "switching" operation and held that, while the
complained-of movements took place in a yard, the case involved train movements subject to the air-brake provisions. Seaboard Air Line R.R. Co., 361 U.S. at 82, 80 S. Ct. at 15. We should not imply
that the hand brake provision does not apply to switching operations merely because the air-brake
provision does not. 

 Likewise in Northern Pacific, the Supreme Court considered whether the provision of the
FSAA requiring a certain percentage of the train's air-brakes to be coupled so as to be under engine
control applied to two transfer trains. It held that "[a] moving locomotive with cars attached is
without the provision of the act only when it is not a train; as where the operation is that of
switching, classifying and assembling cars within railroad yards for the purpose of making up trains." 
Northern Pac., 254 U.S. at 254-55, 41 S. Ct. at 102. We conclude that the logical interpretation of
the phrase "the provision of the act" is that it is a reference to the air-brake provision since that is
the provision at issue in the case. Again, we shall not imply that the hand brake provision does not
apply merely because the air-brake provision does not. 

 Finally, the Phillips court relied on Trinidad, a Fifth Circuit case also applying the air-brake
provisions of the FSAA. The Trinidad court determined that the air-brake provisions, the only
provisions relied on by the plaintiff, did not apply. It reasoned that the train, which was assembled
in Southern Pacific's yard, had not been released because of an incomplete inspection and had not,
therefore, passed from the assembly phase to the "in use" phase. Trinidad, 949 F.2d at 189. 
Specifically, referencing sections one and nine, the old FSAA section numbers containing the air-brake provisions, the court stated that, because the train was not in use, it was not covered by the
train brake provisions of the Act. Id. The Trinidad court did not comment on the applicability of
the hand brake provision to any given situation.

 In short, the cases relied on in Phillips to support its holding that switching operations do not
fall within the definition of "in use" under the FSAA do not support that holding. We shall now
review other pertinent case law.

 As the Fourth Circuit has previously stated, "[t]he purpose of the law is the guide to its
interpretation." Virginian Ry. Co. v. United States, 223 F. 748, 751 (4th Cir. 1915). Further, "[t]he
beneficial and remedial purposes of these statutes must not be defeated by strained construction." 
Id. at 752. The controlling test of the statute's application lies in the essential nature of the work
done. United States v. Chicago, Burlington & Quincy R.R. Co., 237 U.S. 410, 413, 35 S. Ct. 634,
636, 59 L. Ed. 1023 (1915). Significantly, the purpose of the FSAA is to promote the safety of
employees and travelers and the statute should be liberally construed as a safety measure. Seaboard
Air Line R.R. Co., 361 U.S. at 83, 80 S. Ct. at 16; Delk v. St. Louis & San Francisco R.R. Co., 220
U.S. 580, 582, 31 S. Ct. 617, 619, 55 L. Ed. 590 (1911). 

 In construing the FSAA, it is appropriate to consider the context in which the individual
provisions of the statute must be applied. For instance, in determining the applicability of the air-brake provision to transfer trains running on a main track between two yards, the Supreme Court has
noted that the trains were exposed to the hazards which the air-brake provision was intended to avoid
or minimize. See Chicago, Burlington & Quincy R.R. Co., 237 U.S. at 412, 35 S. Ct. at 635. 
Although these "trains" were merely made up of cars being moved from one yard to another, they
came within the air-brake requirement. Id. Thus, the Court focused on furthering the FSAA's
purpose of promoting safety. 

 Interpretation and application of a provision of the FSAA that is similar to the hand brake
provision provides guidance. Section 20302(a)(1)(A) requires vehicles to be equipped with
automatic couplers. 49 U.S.C.A. § 20302(a)(1)(A). Finding that the car in question was being used
in interstate traffic when the plaintiff was injured, courts have repeatedly held that the FSAA applies
in cases where the plaintiff's injury, incurred while the plaintiff was engaged in switching operations,
resulted from a defective coupler. See Great N. Ry. Co. v. Otos, 239 U.S. 349, 351, 36 S. Ct. 124,
125, 60 L. Ed. 322 (1915); Delk, 220 U.S. at 585-86, 31 S. Ct. at 620; United States v. Houston Belt
& Terminal Ry. Co., 210 F.2d 421, 424 (5th Cir. 1954); Erie R. Co. v. Russell, 183 F. 722, 724-25
(2d Cir. 1910), error dismissed, cert. denied, 220 U.S. 607 (1911). 

 Further, at least four jurisdictions have applied the FSAA in cases involving injuries
occurring during switching operations and allegedly caused by defective hand brakes. However, we
note that the applicability of the FSAA was neither questioned nor discussed in these cases. See
Texas & Pacific Ry. Co. v. Griffith, 265 F.2d 489 (5th Cir. 1959); Missouri-K.-T. R.R. Co. v.
Ridgway, 191 F.2d 363 (8th Cir. 1951); Hosman v. Southern Pac. Co., 83 P.2d 88 (Cal. App. 1938),
cert. denied, 306 U.S. 656 (1939); Didinger v. Pennsylvania R.R. Co., 39 F.2d 798 (6th Cir. 1930). 
 It is because safety in the yard during switching operations requires efficient hand brakes that
Congress passed the hand brake provision. Robb v. Burlington N. & Santa Fe Ry. Co., 100 F.Supp.
2d 867, 870-71 (N.D. Ill. 2000). As other courts have considered during discussions of this issue,
if the "efficient hand brakes" provision of the FSAA does not apply during switching operations, it
is difficult to see when it would ever apply. Williams v. Norfolk So. Ry. Co., 126 F. Supp.2d 986,
992 (W.D. Va. 2000); Robb, 100 F. Supp. 2d at 870. Further, there is no provision of the statute or
any exception carved out by case law excluding employees who work in switching yards. On the
contrary, the Supreme Court has held that a railroad employee's designation as yard or switching
crew was not material. The controlling test of the statute's application lies in the nature of the work
done. Chicago, Burlington & Quincy R.R. Co., 237 U.S. at 413, 35 S. Ct. at 636. Generally
speaking, the cars and railroad employees in the yard are exposed to the hazards which the provision
requiring efficient hand brakes is intended to avoid or minimize. See Chicago, Burlington &
Quincy R.R. Co., 237 U.S. at 412, 35 S. Ct. at 635. Efficient hand brakes are a necessary safety
measure in rail yards. Accordingly, construing the hand brake provision as a safety measure would
lead us to apply that provision to switching operations. 

 We conclude that the hand brake provision of the FSAA applies to the switching activities
Synar was engaged in when injured. Therefore, it is improper to say that UP was entitled to
judgment as a matter of law on Synar's FSAA claim. See Mancorp, Inc., 802 S.W.2d at 227-28. 
The attempt to exempt switching activities was actually an attack on the sufficiency of the evidence
to prove the cars on which Synar was injured were "in use" at the time of the injury. There is no
dispute that the cars were involved in switching operations. As switching operations constitute "use"
under the FSAA, the record shows there is more than a scintilla of competent evidence to support
the jury's finding in answer to question four. See Navarette, 706 S.W.2d at 309. Accordingly, the
trial court erred in disregarding the jury's affirmative answer to question four based on the reasoning
that the FSAA does not apply to switching operations. We sustain Synar's first issue.

Identification of Defective Hand Brakes

 In his second issue, Synar contends the trial court erred in determining that he must identify
the specific defective hand brakes that caused his injury and in disregarding the jury's answer to
question four because he failed to do so. Synar asserts that the evidence shows the hand brakes on
the cars in the Muskogee yard were inefficient and caused injuries. He further argues that the trial
court's ruling on this issue is contrary to legislative intent and impermissibly denied him his right
to trial by jury on this issue. Also, Synar argues that the trial court's conclusion is illogical and
impracticable based on the nature of the injury and that its reasoning is internally inconsistent with
its reasoning for not disregarding the jury's answer on the FELA cause of action.

 The FSAA itself does not specifically state a requirement that the plaintiff identify the
specific defective hand brake that caused his injury. See 49 U.S.C.A. § 20302. UP relies on the
Supreme Court's Myers case and a Seventh Circuit case, Richardson v. Consolidated Rail Corp.,
17 F.3d 213 (7th Cir. 1994), for the proposition that Synar "bears the burden of establishing that a
particular hand brake failed to work efficiently and properly." We do not agree that either case
stands for that proposition. 

 In Myers, the Supreme Court explained that there are two recognized methods of showing
the inefficiency of hand brake equipment. The plaintiff may introduce evidence showing some
particular defect or evidence showing a failure to function. Myers, 331 U.S. at 483, 67 S. Ct. at
1338. The Myers court did not require the plaintiff to identify a particular hand brake. The Seventh
Circuit, in Richardson, addressed the question of whether the jury could consider evidence of a hand
brake's condition before and after the incident during which the plaintiff was injured. In determining
that the jury could consider such evidence, the Richardson court did not state that the plaintiff had
to identify a specific, defective hand brake. See Richardson, 17 F.3d at 216-17. Although the
plaintiff in both of these cases was injured on a single, identified car and therefore the specific
defective brake was identified, the question now before us was not addressed by these cases.

 Finding no cases that address the specific question before us, we turn to the Supreme Court
for guidance in construing the FSAA. We start with the basic proposition that the FSAA is to be
liberally construed in the light of its prime purpose, the protection of employees and others by
requiring the use of safe equipment. Lilly v. Grand Trunk W. R.R. Co., 317 U.S. 481, 486, 63 S.
Ct. 347, 351, 87 L. Ed. 411 (1943). The case of Urie v. Thompson, in which the Supreme Court
addressed the question of the extent of coverage of FELA and the Boiler Inspection Act, is
instructive and we shall borrow from its reasoning. See Urie, 337 U.S. at 180-95, 69 S. Ct. at 1030-37.

 Liability for a violation of the FSAA springs from the fact that it is unlawful to use cars not
equipped as required. Urie, 337 U.S. at 195 n.34, 69 S. Ct. at 1037 n.34. The wording of the statute
is not restrictive. Requiring a plaintiff with a repetitive trauma injury, alleged to have been caused
by use of hand brakes on hundreds of railroad cars over the course of many years, to identify specific
defective hand brakes would make recovery for that plaintiff impossible. This would result in the
elimination of an entire subset of plaintiffs from the purview of the statute's benefit. Construing the
FSAA to require such specific identification would therefore defeat the intent of Congress in passing
the FSAA. The FSAA is to facilitate employee recovery, not defeat it. Urie, 337 U.S. at 189, 69 S.
Ct. at 1034. It would not make sense to designate violation of the statute as a per se violation and
then contract the scope of compensable injuries thereby defeating recovery for an entire group of
plaintiffs. Urie, 337 U.S. at 190, 69 S. Ct. at 1034-35. When the acts of the railroad impair an
employee's health by requiring him to work under conditions likely to bring about harmful
consequences, the injury is just as valid and compensable when it follows a course pursued over an
extended period of time as when it happens suddenly. See Urie, 337 U.S. at 186-87, 69 S. Ct. at
1033. We conclude that the FSAA does not require Synar to identify specific hand brakes that
contributed to his injury. Accordingly, the trial court erred in disregarding the jury's answer to
question four based on the reasoning that Synar failed to identify the specific hand brakes that caused
his injury. We sustain Synar's second issue and reinstate the jury's affirmative answer to question
four, finding UP liable under the FSAA. 

Sufficiency of the Evidence

 UP asserted alternatively in its first cross-point that there was no evidence to support the
jury's answer to question four. The focus of this cross-point is UP's assertion that question four was
improperly submitted because it tracks the language of the Boiler Inspection Act. However, UP did
not argue its no evidence issue under this cross-point. It is not clear whether UP is asserting there
is no evidence to support an affirmative finding that it violated the FSAA or whether it asserts there
is no evidence to support an affirmative finding that it violated the Boiler Inspection Act. As we
explain below, question four properly presented the FSAA claim to the jury. The rules require
parties to discuss the facts and the authorities upon which they rely to maintain their issues. Tex.
R. App. P.38.1(h). Mere assertions of error, without argument or authority, waive error. Jones v.
Texas Pac. Indem. Co., 853 S.W.2d 791, 796 (Tex. App.-Dallas 1993, no writ) (on reh'g). To the
extent UP complains in its first cross-point that there is no evidence to support the jury's answer, that
complaint is waived. However, our discussion of UP's second cross-point speaks to this issue.

 In its second cross-point, UP contends the evidence is insufficient to support the jury's
answer to question four. UP complains that Synar did not identify a particular defect, a specific
failure to function, or the particular hand brake that caused him injury. Additionally, UP contends
Synar did not prove the hand brakes which caused his injury were on a car UP was using on its line
or that UP was engaged in interstate commerce at the time of the alleged injury.

 We have already addressed the question of whether Synar had to identify a particular hand
brake that caused his injury and determined that the statute does not require such specificity in this
type of case. See generally Urie, 337 U.S. at 183-91, 69 S. Ct. at 1031-35. We have also considered
the question of whether Synar was injured on cars used on UP's line. We determined that switching
operations fall within the meaning of the phrase in use on the carrier's line and there is no question
that Synar was engaged in switching operations at the time he was injured. Therefore, the record
shows he was injured by hand brakes on cars which UP was then using on its line. See Robb, 100
F.Supp. at 870-71. Likewise, we have considered the issue of whether UP was engaged in interstate
commerce and we determine that the record shows that UP was so engaged. See Darling, 3 F.2d at
987-88. Finally, we now consider whether the record also supports a finding that Synar was injured
on inefficient hand brakes on UP's cars.

 Synar had worked as a switchman and brakeman for more than fifteen years at the time his
injuries were diagnosed. Synar testified that he set seventy-five to one hundred hand brakes a day. 
He estimated that about thirty percent of the hand brakes he encountered required a lot of force and
two hands to set. Gerald Garretson, a UP employee, testified that about thirty percent of hand brakes
on cars in the Muskogee yard are defective. Douglas Hammer, who worked as a brakeman in the
Muskogee yard, testified that ten to fifteen percent of the hand brakes that had to be tied were
extremely hard to tie. Some brakes required both hands and feet. Dr. Kress's test showed that the
amount of force required to manipulate the hand brake tested was in excess of the recommended
weight loads. Kress testified that Gary Scott, UP's highest ranking management official in
Muskogee, told him that the hand brake he tested was representative of all hand brakes on cars in
the Muskogee yard. However, Scott testified that the cars Kress tested were not representative of
the cars in the Muskogee yard. Quentin Pickering, Synar's expert witness, stated that in his opinion,
hand brakes requiring excessive force to set are defective and inefficient. Scott, who testified that
the cars in the Muskogee yard are inspected regularly and well-maintained, explained that a defective
hand brake is one that will not tighten the brake. He also stated that UP employees are told not to
use excessive force to tighten hand brakes. In response to Pickering's testimony, Scott denied that
between one-third and two-thirds of all hand brakes on cars in the Muskogee yard were defective. 

 Thus, the jury had before it evidence that, over a period of many years, Synar set many hand
brakes and that up to approximately one third of them were difficult to set. Some witnesses
considered those brakes to be defective while Scott asserted that a hand brake is not considered
defective unless it will not tighten. The jury also heard evidence that the cars in the Muskogee yard
were well-maintained and that not many hand brakes were defective. It is for the jury to resolve
conflicts in the evidence. The jury reasonably could infer that at least some of the hand brakes Synar
had to set were not efficient. See Myers, 331 U.S. at 484, 67 S. Ct. at 1339. Accordingly, the
evidence supports the jury's answer to question four. We overrule UP's second cross-point.


Charge Error

Question Four

 In its first cross-point, UP asserts that, assuming the trial court improperly disregarded
question number four, Synar is not entitled to judgment on his FSAA claim because the issue was
improperly submitted to the jury. UP complains that question four tracks the language of the Boiler
Inspection Act, not the FSAA. Further, it contends the trial court erred in failing to ask whether UP
had violated the FSAA generally or whether UP used on its line cars equipped with inefficient hand
brakes. UP asserts that there was no issue submitted on the FSAA and the jury's answer to question
four had no legal effect.

Applicable Law 

 Trial courts have broad discretion in formulating a charge by which to submit disputed issues
to the jury. Varme v. Gordon, 881 S.W.2d 877, 881 (Tex. App.-Houston [14th Dist.] 1994, writ
denied). The trial court must, whenever feasible, submit the cause upon broad-form questions and
must give proper instructions and definitions to enable the jury to render a verdict. Tex. R. Civ. P.
277. If the jury charge resolves the controlling issues raised by the pleadings and any evidence in
a feasible manner that does not confuse the jury, no error occurs. Friday v. Spears, 975 S.W.2d 699,
700 (Tex. App.-Texarkana 1998, no pet.).

 The standard of review on appeal for charge error is whether the trial court abused its
discretion. Texas Dept. of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990) (on reh'g). 
Abuse of discretion occurs only when the trial court acts without reference to any guiding principle.
Id. An appellate court may not substitute its judgment for that of the trial court, but must determine
whether the trial court's action was arbitrary or unreasonable. McFarland v. Sanders, 932 S.W.2d
640, 644 (Tex. App.-Tyler 1996, no writ). We must consider the pleadings of the parties, the
evidence presented at trial, and the charge in its entirety. Island Recreational Dev. Corp. v.
Republic of Texas Sav. Ass'n, 710 S.W.2d 551, 555 (Tex. 1986) (on reh'g).

Discussion

 A railroad may be held liable for a violation of the FSAA if the jury can reasonably infer
from the evidence that the hand brake which caused the injuries was on a car which the railroad was
using on its line, in interstate commerce, and that the brake was not an efficient hand brake. Myers,
331 U.S. at 482-83, 67 S. Ct. at 1338. In question four, the jury was instructed that a common carrier
that is subject to the provisions of the FSAA violates the FSAA if it hauls, permits to be hauled, or
uses on its line any car with an inefficient hand brake. Question four asked the jury if UP's failure,
if any, to provide cars in proper condition and safe to operate was a cause of Synar's injury. 

 UP asserts that question four tracks the language of the Boiler Inspection Act, 49 U.S.C.A.
§ 20701 (West 1997). That statute provides: 


 A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when
the locomotive or tender and its parts and appurtenances-



 are in proper condition and safe to operate without unnecessary danger of personal injury;

 have been inspected as required under this chapter and regulations prescribed by the Secretary of
Transportation under this chapter; and

 can withstand every test prescribed by the Secretary under this chapter.





Id. The only similarity between question four and the Boiler Inspection Act lies in the fact that they
both contain the phrase "in proper condition and safe to operate without unnecessary danger of
personal injury." As it is the purpose of the Safety Appliance Act to promote safety by ensuring that
each car is properly equipped, we see no error in borrowing the phrase. Further, the instructions
accompanying question four track the language of the Safety Appliance Act as it read prior to the
1994 recodification. See 45 U.S.C.A. § 11 (West 1986) (current version at 49 U.S.C.A. § 20302). 
Although the charge did not specifically track the current version of the FSAA, the jury was
adequately and correctly informed of the relevant law which enabled it to reach a verdict. See 49
U.S.C.A. § 20302; Myers, 331 U.S. at 482-83, 67 S. Ct. at 1338. Further, the question and
instructions were not misleading, confusing, or prejudicial. We conclude that the question and
accompanying instructions, taken together, properly submitted this issue to the jury. Accordingly,
the trial court did not abuse its discretion in submitting question four and the jury's answer
constitutes a finding that UP violated the provisions of section 20302 of the FSAA. See Friday, 975
S.W.2d at 700. We overrule UP's first cross-point.

UP's Requested Jury Instructions

 a. Limitations

 In its sixth issue, UP asserts that the trial court erred in failing to give UP's requested
question number four, on the issue of limitations, and erred in submitting question number five as
it was worded. UP contends that question number five erroneously placed the burden of proof on
UP. It further contends that question was confusing and should have only inquired whether Synar
did not know that his injury was work related prior to a day certain.

 Applicable Law

 While the substantive law contained in jury instructions in FELA cases is federal and should
not vary whether the case is tried in state or federal court, the instructional format is procedural and
is a matter for the state to regulate. Dutton v. Southern Pac. Transp., 576 S.W.2d 782, 784 (Tex.
1978). Trial courts have broad discretion in formulating a charge by which to submit disputed issues
to the jury. Varme, 881 S.W.2d at 881. The trial court must, whenever feasible, submit the cause
upon broad-form questions and must give proper instructions and definitions to enable the jury to
render a verdict. Tex. R. Civ. P. 277. The trial court should submit instructions only when it
determines that the instructions will help the jury to understand the meaning and effect of the law
and the presumption created thereby. City of Austin v. Houston Lighting & Power Co., 844 S.W.2d
773, 794 (Tex. App.-Dallas 1992, writ denied).

 Discussion 

 Question five as submitted asked the jury the following question: "On what date did Kenneth
Synar first become possessed of the critical facts of his alleged work related injury and its
causation?" It was followed by this instruction: "Critical facts are those that either did or in the
exercise of ordinary care should have placed him on notice that work related activities were causing
injury, if said activities did cause injury." The jury answered "2/18/94."

 UP's requested question and instruction on the issue of limitations was as follows:


 Did Plaintiff know his condition was work-related or should he have been reasonably aware of the
critical facts of his alleged injury and its causation prior to September 29, 1992? A critical fact
causing a claim to accrue can be an event that should put Plaintiff on notice to check for injury even
if the event is only minor.



 Question five merely asked the jury to determine when Synar had enough information to
know his injuries were caused by his work at the railroad. This instruction accurately reflects the
law on accrual in FELA cases. A claim accrues when the claimant should reasonably have been
aware of the critical facts of injury and causation. DuBose, 729 F.2d at 1030. The question as given
was open-ended and asked the jury to determine the month, day and year. UP's requested question
asked if Synar knew or should have known the same critical facts prior to a date certain. We discern
no substantive difference in this wording. A party cannot complain when the judge submits an issue
substantially similar to the one it requested. Maddox v. Denka Chem. Corp., 930 S.W.2d 668, 670 
(Tex. App.-Houston [1st Dist.] 1996, no writ). Further, we disagree that the question given to the
jury placed the burden on UP. It merely asked the jury for a date. Finally, while the last sentence
in UP's requested instruction on limitations, regarding critical facts, is a correct statement of the law,
that alone is not a sufficient reason to require the trial court to include it in the charge. Kansas City
So. Ry. Co. v. Stokes, 20 S.W.3d 45, 49 (Tex. App.-Texarkana 2000, no pet.). Because the
instruction given accurately reflects the law, the trial court did not abuse its discretion by
determining that the jury did not need this expanded explanation of what constitutes a critical fact. 
See City of Austin, 844 S.W.2d at 794. We overrule UP's sixth issue.

 b. Negligence

 In its fifteenth issue, UP asserts that the trial court erred in not submitting its requested
instructions numbers eight through fourteen and seventeen. UP contends that the trial court's denial
of these instructions denied its right to a substantive defense as such instructions are an integral part
of what constitutes negligence under FELA.

 UP submitted the following requested instructions which the trial court denied:


 Number 8: Plaintiff has sued the Railroad under the Federal Employer's Liability Act, referred to as
the FELA. The FELA protects the employee only if they are injured in the course and scope of their
employment. Plaintiff cannot recover for injuries that were not sustained in the course and scope of
his employment with the Railroad.


 Number 9: In order to recover under FELA, Plaintiff must prove that the Railroad was negligent. 
Mere proof that the work place is dangerous or a difficult place to work does not make the Railroad
liable without proof of negligence. The Railroad is not held to an absolute responsibility for the
reasonably safe condition of the place, tools and appliances, but only to the duty of exercising
reasonable care to that end. The fact that an employee is injured is not proof of negligence of the
Railroad.


 Number 10: Union Pacific had a right to assume that Plaintiff would exercise reasonable care for his
own safety and that he would not disobey safety rules and practices.


 Number 11: Union Pacific cannot be charged with negligence in this case by failing to anticipate that
Plaintiff would not take the ordinary and proper precautions to protect and safeguard his health and
welfare. As part of their duties, railroad employees must exercise due care for their own safety.


 Number 12: In order to prove that the Railroad was negligent in violation of the Federal Employers
Liability Act, 45 U.S.C. § 51, et seq., the Plaintiff must prove, by a preponderance of the evidence,
that the Railroad knew, or, in the exercise of ordinary care, should have known, that a dangerous
condition existed.


 Under the law, even after proof of an unsafe or defective condition, the Plaintiff must prove that
Defendant knew, or in the exercise of ordinary care, should have known of the unsafe condition, if he
is to recover under the Federal Employer's Liability Act, 45 U.S.C. § 51, et seq.


 Number 13: During all the time he was working, and at the time of the alleged occurrence in question,
the law imposed upon Plaintiff the duty to exercise reasonable care for his own safety. The Railroad
owed him no duty to exercise a higher degree of care for his safety than he owed to himself. The
Railroad is not an insurer of the safety of its employees; employees, particularly those working in
yards, must as part of their duty exercise due care for their own safety.


 Plaintiff was required to exercise reasonable care to protect himself from injury from the ordinary
hazards and dangers of his employment not resulting from the Railroad's negligence and to protect
himself from injury from such hazards however and whenever they might be encountered.


 Number 14: The Plaintiff is making a claim under the Federal Employers Liability Act ("FELA"). To
recover, the Plaintiff must prove each of the following elements by a preponderance of the evidence.


 First: That at the time of the Plaintiff's injury, he was an employee of the Defendant performing duties
in the course of his employment;


 Second: That the Defendant was at such time a common carrier by railroad, engaged in interstate
commerce;


 Third: That the Defendant was "negligent;" and


 Fourth: The Defendant's negligence was a "legal cause" of damage sustained by the plaintiff.


 Under the FELA, the railroad has a non-delegable duty to furnish a reasonably safe place for
employees to work. The Plaintiff claims that the Defendant was negligent in failing to meet its duty
under the FELA to exercise care to provide him with a reasonably safe place to work.


 Number 17: For Plaintiff to recover for injuries sustained in the course of employment, those injuries
must be the requisite precipitating physical injury.

 The trial court included the following Texas Pattern Jury Charge definitions in the charge:



 NEGLIGENCE means failure to use ordinary care, that is, failing to do that which a person of
ordinary prudence would have done under the same or similar circumstances or doing that which a
person of ordinary prudence would not have done under the same or similar circumstances.


 ORDINARY CARE means that degree of care that would be used by a person of ordinary prudence
under the same or similar circumstances.


 By the term CAUSE IN WHOLE OR IN PART, as used in this charge, means a cause which played
any part, no matter how small, in producing the injury for which damages are sought.



 The trial court submitted the following questions and instructions on the issue of negligence:



 Question Number 1: Was the negligence, if any, of the Missouri Pacific Railroad Company d/b/a
Union Pacific Railroad Company a cause, in whole or in part, of the injuries in question, if any,
sustained by Kenneth Synar?

 

 You are instructed that under the Federal Employers' Liability Act, the railroad company was under
a continuing, nondelegable duty to exercise ordinary care in providing Kenneth Synar with a
reasonably safe place to work, reasonably safe conditions in which to work, and reasonably safe tools
and equipment. This duty includes the duty to inspect the premises where the Railroad employees will
be working and their equipment. This does not mean that the Railroad is an insurer of the safety of
the employee. The extent of the Railroad's duty is to exercise ordinary care under the circumstances
to see that the work place and equipment is reasonably safe. This duty exists at all times and applies
at all places where the Railroad requires it's employees to work. 

 Answer "Yes" or "No". The jury answered, yes.


 Question Number 2: Was the negligence, if any, of Kenneth Synar a cause, in whole or in part, of the
injuries in question, if any, sustained by Kenneth Synar?


 You are instructed that the Missouri Pacific Railroad Company d/b/a Union Pacific Railroad Company
bears the burden of proof by the preponderance of the evidence (as that term has been previously
defined) on the question of Kenneth Synar's negligence, if any. You are instructed that it was the
continuing duty of Kenneth Synar to exercise reasonable and ordinary care for his own safety and
protection. 

 Answer "Yes" or "No". The jury answered yes.



 Discussion

 Much of what UP requested was included in the charge given. As UP has no actual
complaint with regard to those requests, we will not address them. See Maddox, 930 S.W.2d at 670. 
Requested instruction number eleven has been considered and rejected by the Fifth Circuit. It is a
negative instruction which was properly refused as it might confuse the jury. See Almendarez v.
Atchison, Topeka & Santa Fe Ry. Co., 426 F.2d 1095, 1097 (5th Cir. 1970) (no error in denying
request to instruct jury that railroad is not negligent for failing to anticipate employee's carelessness
or lack of care).

 Requested instruction number twelve focuses on the foreseeability element of FELA. The
content of that requested instruction is addressed in the charge as given through the explanation of
UP's duty to Synar and the definitions of negligence and ordinary care. The jury was instructed that
UP had the duty to "exercise ordinary care under the circumstances" to provide a safe work
environment for its employees. The definitions of negligence and ordinary care also referenced the
circumstances under which the "person of ordinary prudence" was acting. Forseeability is a part of
the "circumstances" to be considered by the jury in determining whether the carrier used ordinary
care. See Gallick v. Baltimore and Ohio R.R. Co., 372 U.S. 108, 117-19, 83 S. Ct. 659, 665-66, 9
L. Ed. 618 (1963) (instruction on negligence encompassed foreseeability element). Accordingly, the
jury was instructed that if the danger cannot reasonably be foreseen, the law will not impose any
liability on the carrier. See Johnson v. National R.R. Passenger Corp., 989 P.2d 245, 248-49 (Colo.
Ct. App. 1999) (instruction explaining ordinary care informed jury of foreseeability issue). Specific
use of the word "foreseeability" is not required. Merando v. Atchison, Topeka & Santa Fe Ry. Co.,
656 P.2d 154, 162-63 (Kan. 1982). We conclude that the charge as given incorporated the
foreseeability issue and thus it was considered by the jury. As the substance of the requested
instruction was included in the charge, the trial court did not err in denying the requested instruction.

 The element that the plaintiff must, at the time of injury, be an employee of the defendant
performing duties in the course of his employment is adequately presented in the instruction
accompanying question one. That instruction explained that the railroad had a duty to provide a safe
place for Synar and all railroad employees to work. The instruction specifically noted that, while
the duty exists at all times and applies to all places the employees work, the extent of this duty is to
exercise ordinary care under the circumstances to see that the work place and equipment are
reasonably safe. Considering the charge as a whole, we conclude the jury would have understood
that UP cannot be held liable under FELA for injuries Synar suffered while not performing duties
in the course of his employment with UP.

 In requested instruction number fourteen, UP set out the elements an FELA plaintiff must
prove, including that the defendant is a common carrier by railroad engaged in interstate commerce. 
As explained above, the record contains evidence showing that UP is a common carrier by railroad
engaged in interstate commerce. While UP did file a general denial, it presented no controverting
evidence on this issue. A fact issue that is established with uncontroverted evidence and is not in
dispute should not be submitted to the jury. See T.O. Stanley Boot Co. v. Bank of El Paso, 847
S.W.2d 218, 223 (Tex. 1992). Accordingly, as the evidence on this issue was undisputed, the trial
court did not err in refusing to submit the issue to the jury.

 Finally, in requested instruction number seventeen, UP asked the court to tell the jury that
Synar could not recover unless he showed that his injuries were the "requisite precipitating physical
injury." The trial court is not required to use that exact language. The law in this area is well-settled
and the jury should be instructed in accordance with it. The jury should be instructed that it must
determine whether the evidence shows that the railroad's negligence played any part, even the
slightest, in producing the injury for which damages are sought. Rogers, 352 U.S. at 506, 77 S. Ct.
at 448. Here, question number one asked if the railroad's negligence was a cause, in whole or in
part, of Synar's injuries. The charge defined the term "cause in whole or in part" as a cause which
played any part, no matter how small, in producing the injury for which damages are sought. As the
charge properly instructed the jury on this issue, the trial court did not err in denying UP's requested
instruction number seventeen. We overrule UP's issue fifteen.


Damages

Past Medical Expenses

 a. Admissibility of Evidence

 In its sixteenth issue, UP contends that the trial court erred in admitting Plaintiff's Exhibit
40-A, a document purporting to prove the amount of past medical charges Synar has incurred as a
result of his injury. UP argues that the exhibit is inadmissible because it is hearsay that does not fall
within any exception, counsel did not lay the proper predicate and did not properly authenticate it,
and it is not the best evidence of Synar's medical bills. In its seventeenth issue, UP asserts that, as
the jury should not have relied on Exhibit 40-A, in its absence the evidence is legally and factually
insufficient to support the jury's finding of past medical expenses. 

 Plaintiff's Exhibit 40-A is entitled "Medical Bills" and lists four doctors, one hospital, and
one medical center, the dates Synar was seen by each doctor or obtained services at each facility, and
corresponding charges for services. The total for all services was $16,617.10. At trial, Synar's
counsel showed the exhibit to Synar and asked if it was a listing of medical bills for the treatment
of his arm. Synar answered, "Yes, it is." There was no further testimony regarding the exhibit or
the amount of past medical bills Synar has incurred. In answer to question six(g) the jury awarded
$15,473.10 for past medical expenses.

 Although UP asserts that the list was compiled by Synar's counsel, and that seems to be a
reasonable explanation of its creation, the record does not provide any explanation whatsoever. 
Synar did not testify as to its origin, its accuracy, its truthfulness, or his personal knowledge of the
information contained in the list. The record does not reflect that the underlying records were
admissible. Accordingly, Exhibit 40-A was inadmissible hearsay. See Aquamarine Assocs. v.
Burton Shipyard, Inc., 659 S.W.2d 820, 821-22 (Tex. 1983). 

 Further, while Synar may have been attempting to produce a summary pursuant to Texas
Rule of Evidence 1006, he did not meet the requirements of that rule. Rule 1006 provides a method
for avoiding the difficulties involved in producing voluminous records to satisfy the best evidence
rule by allowing summaries to be placed in evidence. See Tex. R. Evid. 1006. However, the
underlying records must be made available to the opposing party. The record does not reflect
whether Synar offered to supply UP with the records from which the information in the list was
taken. Further, the sponsoring party must also demonstrate that the underlying records were
admissible. Aquamarine Assocs., 659 S.W.2d at 821-22. Accordingly, the trial court abused its
discretion in admitting Exhibit 40-A. We sustain UP's sixteenth issue.

 b. Sufficiency of the Evidence

 In its seventeenth issue, UP asserts the jury's answer to question six(g) is not supported by
the evidence. In determining whether there is no evidence to support a jury finding, this Court
considers only the evidence and inferences that tend to support the finding, disregarding all evidence
and inferences to the contrary. Wal-Mart Stores, Inc., 968 S.W.2d at 936. A claim for past medical
expenses must be supported by evidence of the amounts charged or paid, and the reasonableness and
necessity of those expenses. Rivas v. Garibay, 974 S.W.2d 93, 95-96 (Tex. App.-San Antonio 1998,
pet. denied). Exhibit 40-A was the only proof of past medical charges presented by Synar. That
exhibit was inadmissible. Further, while Dr. Slater testified that his fees are reasonable and
customary, he did not testify as to the necessity of his fees. In the absence of Exhibit 40-A, the
record contains no evidence of the dollar amounts charged by Dr. Slater. Additionally, the record
contains no evidence of amounts charged by other doctors and medical facilities or of the
reasonableness and necessity of any of those fees. The evidence does not support Synar's claim for
past medical expenses. Accordingly, we sustain UP's seventeenth issue, reverse the portion of the
judgment awarding Synar damages for past medical expenses, and render judgment that Synar take
nothing on his claim for past medical expenses. See Tex. R. App. P. 43.3.

Future Medical Expenses

 In its eighteenth issue, UP asserts the trial court erred in submitting question six(h), regarding
future medical expenses, because there was no evidence to warrant its submission. UP argues that
Synar failed to present any evidence showing a reasonable probability that he would need any future
surgery or treatment and there was no evidence of a reasonable probability that Synar would incur
medical expenses in the future. Further, it argues, since there was no credible evidence of past
medical, there is nothing upon which to base an award of future medical.

Applicable Law

 A trial court may refuse to submit an issue only if no evidence exists to warrant its
submission. Elbaor, 845 S.W.2d at 243. As this contention is in essence a challenge to the legal
sufficiency of the evidence, this court considers only the evidence and inferences tending to support
the trial court's ruling. Wal-Mart Stores, Inc., 968 S.W.2d at 936.

 To sustain an award of future medical expenses, the plaintiff must show that in all reasonable
probability, expenses accruing from his injury will be necessary in the future. Rosenboom Mach.
& Tool, Inc. v. Machala, 995 S.W.2d 817, 828 (Tex. App.-Houston [1st Dist.] 1999, pet. denied). 
To make this showing, a plaintiff must prove two distinct elements. First, he must present evidence
that he will, in reasonable probability, incur medical expense in the future. Thate v. Texas & Pac.
Ry. Co., 595 S.W.2d 591, 601 (Tex. Civ. App.-Dallas 1980, writ dism'd). Second, he must prove
the probable reasonable amount of the future medical expense. Id. The preferred practice is to have
the physician testify with reasonable professional certainty about the kind of services that will be
required and the reasonable value of those services. However, the only requirement to support a
verdict on this issue is that there be evidence in the record of the reasonable value of past medical
treatment and to establish the probable necessity of future medical treatment. Id. The plaintiff has
the burden of proving with some degree of certainty a factual basis to support the amount of damages
awarded. McCarley v. Hopkins, 687 S.W.2d 510, 513 (Tex. App.-Houston [1st Dist.] 1985, no
writ). 

Discussion

 In order to determine whether question six(h) should have been submitted to the jury, we
must examine the record to see if there is some evidence that Synar will in reasonable probability
incur medical expenses in the future and some evidence of the probable reasonable amount of those
expenses. The jury heard extensive testimony regarding Synar's injury, including the intermittent,
vague symptoms of the early 1990's, the pain and numbness that led him to visit a doctor in 1994,
details of the surgeries and the state of the contents of his right arm as revealed during the surgeries,
as well as a description of the deteriorated state of his arm and hand at the time of trial. Dr. Slater
testified that, at the time of trial, he was still seeing Synar. Synar testified that he would be seeing
Dr. Slater for at least one to two more years. 

 Dr. Slater referred to Plaintiff's Exhibit 5, which was a bill for physical therapy and for Dr.
Slater's services. Dr. Slater testified that the charges are reasonable and customary. He did not tell
the jury the amount of the charges. Plaintiff's Exhibit 5 was not admitted into evidence. The jury
had before it Plaintiff's Exhibit 40-A, the list of past medical charges Synar incurred. However, we
have determined that exhibit was not admissible and should not be considered. Accordingly, while
there is slight evidence that Synar will incur medical expenses in the future, there is no evidence
establishing the cost of any future medical care. See Thate, 595 S.W.2d at 601. We sustain UP's
eighteenth issue, reverse the portion of the judgment awarding Synar damages for future medical
expenses, and render judgment that Synar take nothing on his claim for future medical expenses. 
See Tex. R. App. P. 43.3.

Future Earning Capacity

 In its issues twenty-five through twenty-eight, UP asserts the jury's award for future loss of
earning capacity should not stand. It argues that the trial court should not have submitted the issue
to the jury, should have granted its motion for directed verdict on the issue, and should have
disregarded the jury's answer on the issue. Additionally, it argues that there is no evidence to
support the jury's award as to future loss of earning capacity. Generally, UP argues that there is no
evidence of any future loss of earning capacity and no economic testimony from which the jury could
arrive at the present value of any loss.

 In its twenty-ninth issue, UP asserts the trial court erred in overruling its motion for new trial
on the issue of lost future earning capacity. In its motion for new trial, UP argued that the evidence
is factually insufficient to support the jury's award for lost future earning capacity, or alternatively,
that the award is excessive. It also argued that the evidence is insufficient to show that Synar
mitigated his damages.

Applicable Law

 The contentions in issues twenty-five through twenty-eight are in essence the same challenge
to the legal sufficiency of the evidence. See C & R Transport, Inc. v. Campbell, 406 S.W.2d 191,
193 (Tex. 1966); Elbaor, 845 S.W.2d at 243; Lochinvar, Corp., 930 S.W.2d at 187. In reviewing
these contentions, this Court considers only the evidence and inferences tending to support the
finding, disregarding all contrary evidence and inferences. Wal-Mart Stores, Inc., 968 S.W.2d at
936.

 The standard of review applied to consider a complaint that the trial court erred in denying
a motion for new trial depends on the complaint preserved in the motion. Hicks, 834 S.W.2d at 590. 
A factual sufficiency challenge is governed by a factual sufficiency standard of review. Id. An
allegation that damages are excessive invokes the same standard of review as any factual sufficiency
challenge. Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 406 (Tex. 1998). Thus, we apply
a factual sufficiency standard of review in considering UP's twenty-ninth issue. In addressing a
factual sufficiency challenge, this Court considers all of the evidence on the issue and will set aside
the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong
and unjust. Cain, 709 S.W.2d at 176. 

 Lost earning capacity is left to the discretion of the jury. Strahan v. Davis, 872 S.W.2d 828,
833 (Tex. App.-Waco 1994, writ denied). In Texas, where a plaintiff seeks damages for impairment
of his earning capacity, he must prove the amount of such damages with the degree of certainty to
which it is susceptible. Crown Plumbing, Inc. v. Petrozak, 751 S.W.2d 936, 939 (Tex. App.-
Houston [14th Dist.] 1988, writ denied). The plaintiff must introduce evidence, in monetary terms,
from which a jury may reasonably measure his loss of earning capacity. Id. 

 The proper measure of damages under FELA for the loss of future benefits is the present
value thereof. Chesapeake & Ohio Ry. Co. v. Kelly, 241 U.S. 485, 491, 36 S. Ct. 630, 632, 60 L.
Ed. 1117 (1916). The way in which the jury is aided in determining present cash value is generally
a matter to be determined by the law of the forum. Id. In Texas, the jury has the power to consider
as proven any matter that is of common knowledge in the community. Missouri Pac. R.R. Co. v.
Kimbrell, 160 Tex. 542, 334 S.W.2d 283, 286 (1960). Interest rates and other forms of returns on
money are matters of common knowledge and jurors may be presumed to be able to properly allow
for those matters in estimating the present value of a sum of money payable in the future. Id. 
Accordingly, in Texas, no evidence of the earning power of money must be introduced. Id. The
minimization of damages is a defensive matter and the burden of proving failure to mitigate is on
the party who caused the loss. Missouri Pac. R.R. Co. v. Whitehead, 862 S.W. 632, 634 (Tex. App.
-Tyler 1993, writ dism'd by agr.); P.G. Lake, Inc. v. Sheffield, 438 S.W.2d 952, 956 (Tex. Civ.
App.-Tyler 1969, writ ref'd n.r.e.).

Discussion

 The record shows that Synar's 1995 UP wages were $50,535.13, his 1996 UP wages were
$48,899.22, and his 1997 UP wages were $111,032.53. (2) Synar testified that he made about
$2,500.00 a year doing paint and body work on cars. However, his 1996 income taxes reflected
income of only $400.00 for paint and body work in that year. Synar testified that at the time of the
first surgery he was making $4400.00 per month. Synar testified that he could not return to work
as a switchman. Dr. Slater testified that he would not release Synar to work as a switchman or
brakeman. Dr. Slater also said that Synar is not completely disabled and that there are jobs he will
be released to perform. Synar explained that he is taking computer classes and that after two years
of additional schooling, he might make $10.00 to $12.00 an hour. In question six(b), the jury was
asked what sum of money, if paid now in cash, would compensate Synar for loss of earning capacity
that, in reasonable probability, will be sustained in the future. The jury answered $500,000.00.

 The jury had before it evidence of Synar's past wages. It is uncontroverted that he cannot
return to the job of switchman. As of the time of trial, he was retraining and the jury heard evidence
regarding the rate of pay Synar expected in his new field. This is some evidence from which a jury
could arrive at a figure for Synar's lost future earning capacity. See Petrozak, 751 S.W.2d at 939. 
No economic testimony was necessary for the jury to determine the present value of Synar's lost
future earning capacity. See Kimbrell, 334 S.W.2d at 286. Accordingly, the trial court did not err
in denying UP's motion for directed verdict on the issue of lost future earning capacity, submitting
question six(b) to the jury, or refusing to disregard the jury's answer to question six(b). See
McLaughlin, 943 S.W.2d at 430. We overrule UP's issues twenty-five, twenty-six, twenty-seven,
and twenty-eight.

 The jury was provided specific information regarding Synar's wages up until the time he was
no longer able to work as a switchman. Synar, who was forty-three years old at the time of trial,
testified that he had intended to continue working for UP. Further, in calculating damages, the jury
may assume that but for the injuries suffered, Synar would have continued to work and receive
payment until retirement, disability, or death. Atchison, Topeka and Santa Fe Ry. Co. v. O'Merry,
727 S.W.2d 596, 600 (Tex. App.-Houston [1st Dist.] 1987, no writ). The jury may include damages
to account for likely salary increases in the future. See Roberson, 25 S.W.3d at 258. The jury
awarded Synar $500,000.00 for loss of future earning capacity. Synar was making $4400.00 a month
at the time of the first surgery. The jury could infer from Synar's testimony that, after retraining, he
could hope to make less than $2000 a month in his new career. Based on the evidence, the jury
could have found that Synar's future earning capacity was diminished by $500,000.00. We cannot
say that the jury's award is so contrary to the overwhelming weight of the evidence as to be clearly
wrong and unjust or that it is excessive. See Cain, 709 S.W.2d at 176. We overrule UP's twenty-ninth issue.

Past Lost Wages

 In its thirtieth issue, UP asserts that the trial court erred in denying its motion for new trial
because the damages awarded were excessive. Alternatively, it asserts, the evidence is factually
insufficient to support the damages awarded. UP does not specify in its brief which damages it is
now asserting are not supported by the evidence. We must carefully review the motion for new trial
in order to decipher UP's actual complaint in this issue.

 The only complaint of excessive damages in the motion for new trial was with regard to the
award for lost future earning capacity. That issue was addressed in issue twenty-nine. Likewise, the
factual sufficiency of the evidence to support the award for lost future earning capacity was
addressed in issue twenty-nine. We need not reach the question of the factual sufficiency of the
evidence to support the award for past medical expenses due to our disposition of issue seventeen. 
We note that a complaint about the factual insufficiency of the award for future medical expenses
was not included in UP's motion for new trial and was therefore not preserved for review. See Tex.
R. Civ. P. 324(b)(2). However, there would be no need to reach that question due to our disposition
of issue eighteen. Accordingly, in spite of the heading in the brief under which issue thirty is argued,
"Issues as to Loss of Earning Capacity," the only question presented by issue thirty that remains for
our review is the factual sufficiency of the evidence to support the jury's award of past lost wages.

Applicable Law

 In addressing this challenge, we consider all the evidence on the issue and set aside the award
only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. 
Cain, 709 S.W.2d at 176. In an FELA action, the plaintiff is entitled to recover lost wages, if
proven. See Roberson, 25 S.W.3d at 258; O'Merry, 727 S.W.2d at 599.

Discussion

 The evidence shows that Synar worked until his first surgery which was on July 27, 1998. 
He did not work again until the end of November that same year. Accordingly, he missed
approximately four months of work in 1998. Dr. Slater testified that after examining Synar on
January 29, 1999, Synar was "taken off work." The trial was held in mid-July of 1999. Thus, Synar
missed five and one half months of work before the trial in 1999. Synar testified that at the time of
the first surgery, he made $4400.00 a month. This evidence supports the jury's award of $41,300.00
for past lost wages. See Roberson, 25 S.W.3d at 258; O'Merry, 727 S.W.2d at 599. We overrule
UP's thirtieth issue.


UP's Requested Instruction Number Nineteen

 In its brief, UP listed issues twenty-five through thirty under the heading "Issues as to Loss
of Earning Capacity" and combined its argument for all six issues. The entire argument under this
heading, addressing all six issues, is comprised of twenty-two lines of text. The last four of those
lines of text do not address issues twenty-five through thirty, which are all sufficiency complaints. 
In the last four lines, UP complains that the trial court erred in not granting its requested instruction
number nineteen. The entire argument consists of the statement that the jury should have been
informed as to the definition of earning capacity. A party who presents its complaints to the
appellate court in this multifarious and perfunctory manner, disregarding the Rules of Appellate
Procedure, risks waiver. See Harris County v. Smoker, 934 S.W.2d 714, 718 (Tex. App.-Houston
[1st Dist.] 1996, writ denied). We shall, however, in the interest of justice, address this complaint.

 UP's requested instruction number nineteen is as follows: "Recovery for lost earning capacity
is not based upon actual earnings lost, but on the loss of capacity to earn money." It is followed by
a cite to Southern Pacific Transportation Co. v. Harlow, 729 S.W.2d 946 (Tex. App.-Corpus
Christi 1987), writ denied, 745 S.W.2d 320 (Tex. 1988). While the phrase "earning capacity" is used
in question six, the charge includes no definition or instruction explaining the meaning of that term.

 In Harlow, the case UP relies on in support of its requested instruction, the appellants
complained that the jury award for the plaintiff's loss of earning capacity in the future was not
supported by the evidence. Before reviewing the evidence, the Corpus Christi court of appeals set
out the applicable law, including the above quoted statement of the law that constituted UP's
requested instruction. The Harlow opinion did not set out a definition of the term "earning
capacity." Earning capacity has been defined as the "ability and fitness to work in gainful
employment for any type of remuneration, including salary, commissions, and other benefits,
whether or not the person is actually employed. It does not necessarily mean actual wages, income,
or other benefits received during the period inquired about." Baccus v. American States Ins. Co.
of Texas, 865 S.W.2d 587, 588 (Tex. App.-Fort Worth 1993, no writ); Home Indem. Co. v. Eason,
635 S.W.2d 593, 594-95 (Tex. App.-Houston [14th Dist.] 1982, no writ). Harlow does not stand
for the proposition that the trial court should give a definition of "earning capacity" to the jury. UP
did not submit a requested definition of the term "earning capacity." Therefore, its complaint on
appeal that "[t]he jury should have been informed as to the definition of earning capacity," has not
been preserved. See Tex. R. App. P. 33.1. 

Applicable Law

 The trial court should submit instructions only when it determines that the instructions will
help the jury understand the law. City of Austin, 844 S.W.2d at 794. A trial court has wide latitude
to determine the sufficiency of explanatory instructions and definitions. Plainsman Trading Co.
v. Crews, 898 S.W.2d 786, 791 (Tex. 1995). We consider whether the requested instruction was
reasonably necessary to enable the jury to render a proper verdict. Id. at 790.

Discussion 

 The requested instruction is a correct statement. However, as it does not actually explain
what lost earning capacity is, the trial court could have determined that it would not help the jury
understand the law. We conclude that UP's requested instruction number nineteen was not
reasonably necessary to enable the jury to render a proper verdict. See Plainsmen Trading Co., 898
S.W.2d at 790. As the trial court did not abuse its discretion in refusing to submit UP's requested
instruction number nineteen, we overrule UP's final complaint under issues twenty-five through
thirty.


Conclusion

 Due to the disposition of the above issues, we need not reach UP's issues nineteen, twenty,
twenty-one, and thirty-one. See Tex. R. App. P. 47.1. 

 The jury awarded Synar $41,300.00 for lost past wages, $500,000.00 for lost earning
capacity, $15,473.10 for past medical expenses, and $10,000.00 for future medical expenses. Had
the trial court not disregarded the jury's finding that UP violated the FSAA, the total award would
have been $566,773.10. The trial court subtracted thirty percent, or $170,031.93, for a total award
of $396,741.17. We determine that the jury's findings that UP is liable for $15,473.10 in past
medical expenses and for $10,000.00 in future medical expenses cannot stand. Accordingly, UP is
liable for the $500,000.00 award for lost earning capacity and the $41,300.00 award for lost past
wages, a total of $541,300.00. Because the trial court erred in disregarding the jury's answer to
question four, we reinstate the jury's affirmative answer finding UP liable under the FSAA. As a
result, applying section 53 of the FELA, the jury's total award is not diminished by thirty percent. 

 We reverse the portion of the judgment awarding Synar damages for past medical expenses
and future medical expenses and render judgment that Synar take nothing on his claims for past and
future medical expenses. We delete that portion of the judgment awarding Synar $396,741.17 and
render judgment in favor of Synar in the amount of $541,300.00 with post-judgment interest at ten
percent per annum from the date of the trial court's judgment. As modified, the trial court's
judgment is affirmed.


 SAM GRIFFITH 

 Justice


Opinion delivered October 17, 2001.

Panel consisted of Davis, C.J., Worthen, J., and Griffith, J.
























(DO NOT PUBLISH)
1. The Safety Appliance Act was recodified in 1994. However, Congress intended merely to restate, without
substantive change, laws previously enacted. It declared that the new provisions may not be construed as making a
substantive change in the laws replaced. Pub. L. No. 103-272, § 6, 108 Stat. 881 (1994). Accordingly, we rely on
cases issued before and after the 1994 recodification.
2. About $35,000 of his 1997 wages constitute payment for Synar's being on the "reserve board," a program
through which a UP employee can draw seventy percent of his regular pay although not working at his regular job. 
The remainder of the 1997 wages constitute payment for a different job Synar worked for UP in another location.